John A. Montevideo, SBN 86473
Erin L. Boeck, SBN 273463
**DiMarco │ Araujo │ Montevideo**
A Professional Law Corporation
1324 North Broadway
Santa Ana, California 92706
Tel: (714) 835-6990
Fax: (714) 568-1854
Eboeck@damfirm.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| ERIC KARSGOR; and ROBERT MORAN**,** on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>  v.<br><br>AMPLIFY ENERGY CORPORATION, a Texas Corporation; BETA OPERATION COMPANY LLC d/b/a BETA OFFSHORE, a Texas Corporation; SAN PEDRO BAY PIPELINE COMPANY, a Texas Corporation, and DOES 1-10,<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Eric Karsgor and Robert Moran, ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class"), brings this Class Action Complaint (the "Action") against Defendants Amplify Energy Corporation, Beta Operation Company LLC d/b/a Beta Offshore, San Pedro Bay Pipeline Company, and Does 1-10 (collectively "Defendants"), for violations of state law. The allegations herein are made based on Plaintiffs' personal knowledge as to the allegations pertaining to themselves, and upon information and belief as to all other matters.

## I.   INTRODUCTION

1.     This Complaint arises from a massive crude oil release from an offshore oil pipeline in the Beta Field, which is an oil reservoir located in federal waters, about nine miles off the coast of Huntington Beach, California. The oil pipeline, transporting oil from the Beta Field to a pump in Long Beach, California, began gushing oil just four miles from shore (the "Spill").

2.     The Spill originated from a broken pipeline (the "Pipeline") which connects to an offshore oil platform in the Beta Field named the Elly Platform ("Elly"). Elly is owned and operated by Beta, a subsidiary of Amplify. The Pipeline is owned and operated by San Pedro Bay, also a subsidiary of Amplify.

3.     The release began sometime in the evening hours of October 1 or the early morning hours of October 2, 2021. Beta Offshore's 16-inch San Pedro Bay Pipeline ruptured, resulting in a release of crude oil into the San Pedro Bay, an inlet of the Pacific Ocean (according to the Corrective Action Order issued by the Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety issued on October 4, 2021).

4.     The total amount of crude oil spilled into the Pacific Ocean is yet unknown, but estimates show as much as 144,000 gallons gushed into ocean waters over the first few days of October 2021. The full extent of the Spill, and the length of time before it was stopped, is not currently known.

5.     Residents of the coastal city Huntington Beach, California first reported

**COMPLAINT FOR DAMAGES**

1

odors related to the Spill in the evening of October 1, 2021. Soon after, in the early hours of Saturday, October 2, 2021, a large oil slick was visible in the Pacific less than five miles offshore, already wreaking its havoc on marine life, kelp, dolphins, and boats. By late Saturday night or early morning on Sunday, October 3, 2021, the oil began to wash ashore in Huntington Beach. Now, some months later, beaches are open but tar, as a result of the Spill, continues to wash ashore.

6.     An image of the oil spill can be seen below:



7.     Plaintiffs and members of the proposed classes have suffered and continue to suffer business and/or commercial losses related to commercial sea operations and general commercial operations by virtue of their proximity to the Spill, and the stigma associated with operating so near to the Spill. This lawsuit is brought to recover business and/or commercial losses and other damages by owners/operators of local business in close proximity to the Spill.

## II.    JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Pursuant to the Outer Shelf Continental Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, federal district courts retain jurisdiction over any case "arising out of, or in connection with ... any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."

43 U.S.C. § 1349(b)(1)(A). Additionally, Plaintiffs allege Lost Profits and Earning Capacity Damages Under Federal Oil Pollution Act of 1990, §§ 1002, 1006.

8.     This Court also has diversity of citizenship jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2). The federal district courts maintain original jurisdiction over class action lawsuits wherein the amount in controversy exceeds five million dollars and any member of the Class is a citizen of a state different from any Defendant in the matter. 28 U.S.C. § 1332(d)(2)(A). Plaintiffs allege beyond the minimum five million dollars in damages as a result of the Spill.  Plaintiffs, all citizens of California, are diverse from Amplify and Beta, citizens of Texas. San Pedro Bay is a wholly owned subsidiary of Amplify. Therefore, this matter sits properly in this Court under diversity of citizenship jurisdiction.

9.     This Court has personal jurisdiction over Defendant because they are registered to conduct business in California, they regularly do conduct business in California, and otherwise have sufficient minimum contacts with California.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Defendants have caused harm to Class members residing in this District.

## III.     THE PARTIES

11.     Plaintiff Eric Karsgor ("Mr. Karsgor") is a citizen of California. Mr. Karsgor owns and operates a dog training company which conducts training and lessons frequently on the beachfront of Huntington Beach state beaches. Mr. Karsgor is losing and will continue to lose a substantial amount of his dog training business and clients as a result of the Defendants' oil spill for the foreseeable future as a result of the closures of Huntington Beach state beaches, and the continued stigma surrounding the closures of said beaches, due to the Defendants' collective conduct with respect to the Spill.

12.     Plaintiff Robert Moran ("Mr. Moran") is a citizen of California. Mr.

Moran is a commercial sea urchin fisherman who regularly dives for sea urchins in the various bodies of water in Orange County, California. Due to the beach and harbor closures throughout Orange County that have resulted from the Spill caused the Defendants, Mr. Moran has lost money and profits and his business will continue to be affected in the future.

13.    Defendant Amplify Energy Corporation is a Texas corporation with its principal place of business in Texas. Amplify is an energy company which handles oil and gas acquisition, production, and development throughout the United States.

14.    Defendant Beta Operating Company LLC d/b/a Beta Offshore is a Delaware corporation with its principal place of business in Texas. Beta is a subsidiary company of Amplify. Beta operates the Elly oil processing platform located above the Beta Field oil reserve.

15.    Defendant San Pedro Bay Pipeline Company is a California corporation with its principal place of business in California. San Pedro Bay is a subsidiary company of Amplify.  San Pedro Bay operates the Pipeline which transports crude oil from Elly to an oil pump in Long Beach, California.

16.    Plaintiffs are informed and believe, and on that basis allege, that Defendants Does 1-10 are persons whose identities are unknown to Plaintiffs but who are responsible for the injuries suffered by Plaintiffs. Plaintiffs will amend their Complaint once the identities of the Doe Defendants are ascertained.

17.    Plaintiffs are informed and believe, and on that basis allege, that Defendants Does 1-10 are corporations, partnerships, or entities, the names and addresses of which are currently unknown. Plaintiffs reserve the right to obtain leave of court to amend this Complaint to specify the identities of the Doe Defendants as their identities are ascertained.

18.    Plaintiffs are informed and believe, and on that basis allege, that Amplify, Beta, and San Pedro Bay, and Does 1-10 are jointly and severally liable for each other's negligence, conduct, and wrongdoing.

**COMPLAINT FOR DAMAGES**
4

19.    At all times herein mentioned, each of the Defendants was the agent, servant, employee, joint venturer, partner and/or alter ego of each of the remaining Defendants named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, joint venture, partnership and/or alter ego. Each Defendant has rendered substantial assistance and encouragement to the other Defendants, acting in concert knowing that its conduct was wrongful and/or unlawful, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

## IV.    **FACTUAL ALLEGATIONS**

24.    Plaintiffs and members of the proposed classes are business owners who operate in and around the California coastal cities impacted by the Spill (including but not limited to Huntington Beach, Newport Beach, Dana Point, and Laguna Beach, California).

25.    Elly is an oil processing platform. It was installed and began operating atop the Beta Field oil reserve in 1980.[1]  Elly receives oil via pipeline from nearby oil wells and separates the oil from the water (thus creating crude oil). It then transports crude oil from the Beta Field through the Pipeline to a pump station in Long Beach, California, where the oil is delivered to an oil refinery.[2]  The Pipeline is a sixteen-inch seamless steel crude oil pipeline with a one-inch thick concrete coating that was installed between Elly and Long Beach in 1980.[3]  According to Beta's 2020 Oil Spill Prevention and Response Plan, the Pipeline was transporting roughly 6,000 barrels of oil[4] per day, at pressures ranging between 250 and 720 psi.[5]

---

[1] Bureau of Safety and Environmental Enforcement, Platforms Operated by Beta Operating Company, LLC, https://www.bsee.gov/stats-facts/ocs-regions/pacific/pacific-ocs-platforms/beta-operating-company-llc (last visited Nov. 3, 2021).

[2] Beta Offshore, Oil Spill Prevention and Response Plan at 22-2, 22-26 (Aug. 2020), https://www.bsee.gov/sites/bsee.gov/files/oil-spill-response-plan-osrp/beta-offshore-oil-spill-response-plan-august-2020-redacted.pdf.

[3] *Id*. at 22-26.

[4] One barrel of oil is equal to 42 gallons.  The Pipeline thus pumps roughly 252,000 gallons of oil per day when functioning properly and at normal capacity.

[5] Oil Spill Prevention and Response Plan, *supra* note 2, at 22-27.

**COMPLAINT FOR DAMAGES**

26.     Residents of Huntington Beach, California first reported odors in the air related to the Spill on the evening of Friday, October 1, 2021.[6]   The California Governor's Office of Emergency Services began receiving reports in the evening of October 1, 2021, of oil in the water off the coast of Huntington Beach.[7]   Residents continued to notice a foul smell in the air through the morning of Saturday, October 2, 2021.[8]

**A.     Failure to Notify and Shutdown Pipeline**

27.     According to the Corrective Action Order ("CAO") issued by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), Office of Pipeline Safety ("OPS"), Beta Offshore's 16-inch San Pedro Bay Pipeline ruptured at approximately 02:30 Pacific Daylight Time (PDT) on October 2, 2021, resulting in an uncontrolled release of crude oil into the San Pedro Bay, an inlet of the Pacific Ocean.[9]

28.     However, Amplify failed to notify the U.S. Coast Guard National Response Center until 06:01 PDT – *over three hours later* – allowing the ruptured pipe to release crude oil into the Pacific Ocean, uncontrolled, for hours.[10]

29.     According to reports, the Coast Guard was notified of the oil sheen by a Good Samaritan (not Amplify).[11]   Amplify only notified the U.S. Coast Guard after its company inspectors noticed oil in the water. Amplify did not report shutting down

---

[6] Hannah Fry et al., *The smell of oil wafted in the air Friday. Why did it take another day to identify massive O.C. spill?*, L.A. TIMES (Oct. 3, 2021), https://www.latimes.com/california/story/2021-10-03/why-it-took-a-full-day-to-identify-massive-oc-oil-spill.

[7] Governor's Off. of Emergency Services, Hazardous Materials Spill Rep., (Oct. 1, 2021), https://w3.calema.ca.gov/operational/malhaz.nsf/f1841a103c102734882563e200760c4a/f5fe18e46fd4b83f8825876200127f5e?OpenDocument.

[8] Fry et al., *supra* note 6.

[9] PHMSA, Corrective Action Order (Oct. 4, 2021), phmsa.dot.gov/sites/phmsa.dot.gov/files/2021-10/Beta%20Offshore%20CAO.10.04.2021.pdf.

[10] *Id*.

[11] Stefanie Dazio et al., *Evidence suggests ship anchor snagged, dragged oil pipeline*, ABC NEWS (Oct. 5, 2021), https://abcnews.go.com/US/wireStory/records-show-slow-response-report-california-oil-spill-80408304.

**COMPLAINT FOR DAMAGES**
**6**

1   the flow of oil to the Pipeline until <u>Saturday night</u>, at least 24 hours after residents

2   reported smelling oil on shore.[12]

3         30.    In the meantime, Amplify allowed anywhere from 24,696 gallons, or 588

4   barrels, to a maximum of 131,000 gallons, or 3,134 barrels, of oil to be released from

5   the pipeline and flow into the Pacific Ocean, ravaging marine life and quickly

6   approaching bustling coastal towns.  The crude oil also spilled into the Talbert Marsh,

7   an ecological reserve home to dozens of species of birds, including protected and

8   endangered species.[13]

9         31.    Amplify knew or should have known that oil was leaking <u>immediately</u> as

10  the pipe was ruptured. However, Amplify's CEO Martyn Willsher said in a news

11  conference following the Spill that Amplify was not aware of the Spill until Saturday,

12  October 2, 2021.[14]

13        32.    According to Beta's own 2012 Oil Spill Response and Prevention plan,

14  the Pipeline would be "capable of causing significant and substantial harm to the

15  environment in the event of a discharge of oil because of its proximity to navigable

16  waters and adjoining shoreline areas designated as environmentally sensitive by the

17  [Area Contingency Plan]."[15]

18        33.    As of the filing of this Complaint, neither Amplify nor the U.S. Coast

19  Guard has confirmed for exactly how long crude oil was spilling into the ocean before

20  they were able to stop the flow. Amplify has reported that it sent divers to inspect the

21  Pipeline along the sea floor, which is about 80 to 100 feet below the surface, to assess

22

23

24  [12] Corrective Action Order, *supra* note 9.

25  [13] *Id.*

    [14] Amplify Energy, Press Release: Southern California Oil Spill, Oct. 4, 2021,

26  https://www.amplifyenergy.com/investor-relations/press-releases/press-release-
    details/2021/Southern-California-Oil-Spill/default.aspx.

27  [15] Beta Offshore, Oil Spill Prevention and Response Plan at A-24 (Apr. 2012),
    https://www.bsee.gov/sites/bsee.gov/files/oil-spill-response-plan-osrp/inspection-and-

28  enforcement/beta-operating-company-osrp-april-2012.pdf.

**COMPLAINT FOR DAMAGES**

1    the damage.[16]  Despite attempts to patch the Pipeline on Saturday, October 2, Orange

2    County Supervisor Katrina Foley reported that oil continued to spill into the Pacific

3    through the night.[17]

4         34.    Amplify and the U.S. Coast Guard were able to confirm that the oil

5    spilled out of a roughly thirteen-inch crack or split in the Pipeline, a few miles from

6    the Huntington Beach shore.[18]

7         35.    As of the filing of this Complaint, the exact cause of the spill has not been

8    determined. Beta and Elly have had their share of spills and incidents over the years.

9    Before Amplify owned Beta and operated Elly, Elly had another oil spill which leaked

10   2,000 gallons of oil into the Pacific in 1999, leading to $48,000 in fines.[19] Beta

11   additionally has over 100 reported incidents of non-compliance reported by the

12   Bureau of Safety and Environmental Enforcement, which operates under the U.S.

13   Department of the Interior.[20]

14        36.    Alternatively, U.S. Coast Guard is investigating whether the Pipeline was

15   damaged or broken by a yet-unknown large commercial ship that may have dropped

16   its anchor in the wrong location.[21]  The U.S. Coast Guard and Amplify have reported

17   that the Pipeline was displaced over 100 feet, but have not been able to identify exactly

18

---

[16] Rong-Gong Lin II et al., *What caused the massive oil spill off Huntington Beach? Here is what we know*, L.A. TIMES (Oct. 3, 2021), https://www.latimes.com/california/story/2021-10-03/what-caused-the-massive-oil-spill-off-huntington-beach-here-is-what-we-know.

[17] Hannah Fry et al., *Massive oil spill sends crude onto Orange County beaches, killing birds, marine life*, L.A. TIMES (Oct. 2, 2021), https://www.latimes.com/california/story/2021-10-02/coast-guard-rushes-to-contain-newport-beach-oil-slick.

[18] Madeline Holcomb, *A 13-inch tear in a pipe was likely the source of a California oil spill. Here's how it may have gotten there*, CNN (Oct. 6, 2021), https://www.cnn.com/2021/10/06/us/california-oil-spill-wednesday/index.html.

[19] Connor Sheets et al., *Before O.C. oil spill, platform owner faced bankruptcy, history of regulatory problems*, L.A. TIMES (Oct. 4, 2021), https://www.latimes.com/california/story/2021-10-04/orange-county-oil-spill-amplify-energy-past-problems.

[20] Bureau of Safety and Environmental Enforcement, Beta INC History Since 2010 (Oct. 13, 2021), https://www.bsee.gov/sites/bsee.gov/files/notification-of-incidents-of-non-compliance-incs//beta-inc-data-10-13-21.pdf.

[21] Richard Winton & Deborah Netburn, *Coast Guard designates cargo vessel as 'party in interest' in oil spill*, L.A. TIMES (Oct. 16, 2021), https://www.latimes.com/california/story/2021-10-16/u-s-coast-guard-designates-shipping-container-as-party-of-interest-in-oil-spill.

**COMPLAINT FOR DAMAGES**

when the Pipeline was moved, nor the cause of the displacement.[22]  This investigation remains ongoing and the exact cause of the Spill has not been discovered.

37.    Regardless of the exact cause of the Spill, Defendants displayed a total failure in detection, notification, and response. According to Beta's own Oil Spill Prevention and Response Plan,[23] the Pipeline is continuously monitored by an "automated leak detection system" which includes automated monitoring and reporting to Elly, whose control room is staffed around-the-clock, and leak detection surveillance. Further, Elly is staffed twenty-four hours per day and is connected to an Emergency Shutdown System ("ESD"). The ESD is meant to shut down the flow of oil to the Pipeline within <u>one minute</u>.  Elly has both automatic ESDs in the control room, and manual ESDs, or large red pull knobs located throughout the Elly platform.[24]  In spite of these numerous emergency backstops, neither Amplify nor Beta has made mention of their use in stopping the Spill. Rather, Amplify admittedly knew of the oil spill on Saturday morning, and its operators did not stop the flow of oil to the Pipeline until Saturday night.[25]  Defendants must answer for this breach in their own operating plan that allowed up to 131,000 gallons of oil, to be dumped into the Pacific Ocean and wash ashore nearby beach cities.

**B.    Impacts on Ecology and the Orange County Community**

38.    The Spill has had serious and immediate impacts on the ecology and community of these Orange County beach cities.

39.    The Southern California Coast is a well-known habitat to lush and biodiverse ecology. The Spill has had an immediate impact on unique marine life and birds not only in the Pacific Ocean, but also on the California shore and tide pools, as well as nearby marshes, wetlands, and ecological reserves. The Huntington Beach

---

[22] Richard Winton et al., *Damage to oil pipeline may have occurred up to a year before the spill, investigators say*, L.A. TIMES (Oct. 8, 2021), https://www.latimes.com/california/story/2021-10-08/investigators-probe-timing-california-oil-pipeline-damage.
[23] Oil Spill Prevention and Response Plan, *supra* note 2, at 22-32.
[24] Oil Spill Prevention and Response Plan, *supra* note 16, at E-2.
[25] Corrective Action Order, *supra* note 9.

Wetlands Conservancy alone owns and manages 127 acres of wetlands on the coast, including the Talbert Marsh.[26]   The Talbert Marsh is home to ninety different bird species, including the endangered California least terns, blue herons, and pelicans.[27] Offshore, the California coast is home to tuna, seabass, sea turtles, dolphins, and whales.[28]  Not to be forgotten, countless species of larvae, microscopic organisms, and shellfish call these waters home as well.

40.    Marine life and birds washing ashore dead or covered in oil paint a clear picture of the damage already caused by the Spill.[29]  Crude oil is highly toxic for birds and other marine life to ingest, and can cause cancers and neurological damage.[30] Birds coated in oil have difficulty moving or flying, which can seriously affect migratory patterns, even slowing migration by up to 45 days.[31]  Additionally, marine life and birds and other furry mammals need clean fur and feathers to stay warm, and being coated in oil can cause them to die from hypothermia.[32]

41.    The Spill has also already impacted ecology that cannot be seen, but which has serious long-term impacts: altering marine algae. Marine algae, which is a crucial element of any marine habitat, may respond to oil spills by either dying (causing food chain shortages for the marine life that survives off of algae) or growing more rapidly (causing harmful algae blooms).[33]  Algae, krill, and other microscopic

---

[26] Huntington Beach Wetlands Conservancy Website, About Us, http://www.hbwetlands.org/about.php (last visited Nov. 3, 2021).
[27] Joe Hernandez & Jonathan Franklin, *The California oil pipeline spill could endanger sea life for years, experts say*, NPR (Oct. 5, 2021), https://www.npr.org/2021/10/05/1043127707/the-california-oil-spill-could-endanger-birds-and-sea-life-for-years-experts-say.
[28] Joe Hernandez, *A massive oil spill in the Pacific Ocean has reached the Southern California coast*, NPR (Oct. 3, 2021), https://www.npr.org/2021/10/03/1042846846/a-massive-oil-spill-in-the-pacific-ocean-has-reached-the-southern-california-coa.
[29] U.S. Fish and Wildlife Service, Effects of Oil on Wildlife and Habitat (June 2010), https://www.fws.gov/home/dhoilspill/pdfs/dhjicfwsoilimpactswildlifefactsheet.pdf.
[30] Benji Jones, *Why the Huntington Beach oil spill is so harmful to wildlife*, VOX (Oct. 6, 2021), https://www.vox.com/down-to-earth/22708654/oil-spills-wildlife-huntington-beach-california.
[31] Ivan Maggini et al., Light oiling of feathers increases flight energy expenditure in a migratory shorebird, 220 Journal of Experimental Biology 2372 (2017).
[32] Effects of Oil on Wildlife and Habitat, *supra* note 30.
[33] *Id.*

1    organisms at the bottom of the food chain being killed or contaminated by oil have
2    lasting, long-term effects as they grow and the oil moves up the food chain, not only
3    to other animals, but to humans consuming seafood.[34]

4        42.    The Talbert Marsh, mentioned above, serves a unique and crucial
5    environmental purpose: improving water quality. The Talbert Marsh acts as a natural
6    water filter for the water flowing through it. The Spill has spoiled that process because
7    the Marsh does not have the natural capability to filter out crude oil pollution. [35]

8        43.    As of the filing of this Complaint, the total ecological impacts on marine
9    wildlife in the impacted areas are not yet known.

10       44.    The California Department of Fish and Wildlife closed certain fisheries
11   in areas impacted by the Spill on October 2, 2021[36]   The California Office of
12   Environmental Health Hazard Assessment ("OEHHA") has been conducting
13   sampling and testing of shoreline mussels and surf zone fin fish in an effort to
14   understand the Spill's impact on marine life.[37] While fisheries were recently permitted
15   to re-open, The long term consequences of fishing in the impacted area is not fully
16   understood, and will not be for quite some time.

17       45.    Lobster fishermen were unable to bait and trap lobster for the short
18   harvesting season which was set to begin on October 6, 2021. Many fishers and
19   trappers have lost significant revenue because they have not been able to collect any
20   of the fish or shellfish in their already-set traps. With testing procedures taking months
21   before the fisheries' reopening was be authorized, fishers and trappers were left
22   without income.

23       46.    Residents of Orange County are feeling the physical effects of the Spill

---

24   [34] National Oceanic and Atmospheric Administration, Aquatic food webs (Feb. 1, 2019),
25   https://www.noaa.gov/education/resource-collections/marine-life/aquatic-food-webs.
     [35] Heal the Bay, *What We Know (and Don't) About the Oil Spill in Orange County* (Oct. 29, 2021),
26   https://healthebay.org/oil-spill-in-orange-county-california/.
     [36] California Department of Fish and Wildlife, Amended Declaration of Fisheries Closure (Oct. 7,
27   2021), https://socalspillresponse-com-jtti.s3.us-west-2.amazonaws.com/wp-
     content/uploads/2021/10/07174741/CDFW-Declaration-Amendment_2_10.07.21.pdf.
28   [37] *Id.*                *Map courtesy of California Department of Fish and Wildlife*

as well, with many reporting breathing in fumes. Just as with marine life, oil is damaging to humans' health via inhalation of fumes from off-gassing as well as from dermal contact.[38]  The Orange County Health Department advised that even if oil or tar is not visible, it may still be dissolved in swimming water or airborne, and that exposure can lead to nausea, dizziness, vomiting, headaches, and other symptoms.[39]

47.    While many questions remain, including the exact cause of the Spill, for how long oil was gushing into the Pacific Ocean, and exactly how much oil was spilled, one aspect of the Spill is clear: <u>California's coastal ecosystem has been immediately and severely harmed and will continue to see the effects of the Spill for years to come.</u>

## V.    CLASS ACTION ALLEGATIONS

52.    Plaintiffs assert this class action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1)(A), and 23(b)(3). This action is asserted and properly maintained as a class action because Plaintiffs satisfy the requirements of numerosity, adequacy, typicality, and commonality pre-requisites for suing as representative parties pursuant to Federal Rule of Civil Procedure 23(a).

53.    As detailed in the individual counts below, Plaintiffs seek to represent a Class defined as follows:

> **All persons, entities, and commercial enterprises suffering business, personal, and/or commercial losses in the Orange County, California, coastal cities, including but not limited to Huntington Beach, Newport Beach, Dana Point, and Laguna Beach, beginning on or around October 1, 2021, and continuing as a result of the Oil Spill.**

---

[38] Heal the Bay, *supra* note 36.

[39] Orange County Health Officer on Local Oil Spill – Health Advisory #2 (Oct. 8, 2021), https://ocgov.com/news/county-health-officer-local-oil-spill-health-advisory-2.

54.     Excluded from the Class is any entity in which Defendants have a controlling interest, and officers or directors of Defendants. Also excluded from these Classes is any judge or judicial officer presiding over this matter and the members of his or her immediate family and judicial staff.

55.     Due to the nature of the Oil Spill, the Class is ascertainable. The Class, as defined, identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to self-identify as having a right to recover based on the description, including, but not limited to, by reference to municipal territories and a specific time frame. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the members of each above-named Class through notice published in newspapers or other publications.

56.     The members of the Class are so numerous that a joinder of all members would be impracticable. Huntington Beach alone is home to over 10,000 businesses.[40] Other surrounding beach cities with thousands more businesses are also affected by the oil spill. The Class is therefore likely to exceed thousands of members.

57.     A well-defined community of interest in the questions of law or fact involving and affecting all members of the Class exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual Class members. This action is amenable to a class-wide calculation of damages through expert testimony applicable to anyone in each individual Class. The questions of law and fact common to Plaintiffs and the Class members include, among others, the following:

    a.     Whether Defendants are strictly liable for the harm created by the Oil Spill;

[40] City of Huntington Beach, Business, https://www.huntingtonbeachca.gov/business/ (last visited Nov. 3, 2021).

**COMPLAINT FOR DAMAGES**
13

b.    Whether Defendants were negligent in their construction, maintenance, and operation of the Pipeline;

c.    Whether Defendants owed any duties to Class Members;

d.    Whether Defendants breached one or more duties to Class Members;

e.    Whether Defendants' actions and inactions were a substantial factor in causing harm to Class Members;

f.    Whether Defendants' Discharges caused physical injury to Class Members' businesses;

g.    Whether Defendants have created a public nuisance;

h.    Whether the nuisance Defendants have created is permanent;

i.    Whether Defendants have engaged in an ultrahazardous activity;

j.    Whether Defendants violated any California statutes, including California's. Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*;

k.    The extent to which Class Members have been harmed by the uncontrolled release of crude oil into the Pacific Ocean by the Pipeline; and

l.    What is the proper measure of damages incurred by the Class Members.

58.    Named Plaintiffs' claims are typical of the members of the Class. The evidence and the legal theories regarding Defendants' alleged wrongful conduct are substantially the same for Plaintiffs and the other members of the Class.

59.    Named Plaintiffs will fairly and adequately protect the interests of the Class members they represent. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. Plaintiffs and their counsel intend to prosecute this action vigorously on behalf of the Class.

60.    Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Classes and would lead to repetitious trials of the numerous common questions of fact and law.

61.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Because the injury suffered by any individual Class member may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiffs and Class members individually to seek redress for the alleged wrongful conduct. Even if any individual persons or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation(s) would proceed. The class action device is preferable to individual litigation(s) because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Strict Liability for Ultrahazardous Activities

63.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

64.    At all times herein, Defendants were the owners and operators of the Pipeline and Elly.

65.    At all times relevant to this action, Defendants had supervision, custody, and control of the Pipeline and Elly.

66.    At all times relevant to this action, Defendants were under a continuing

duty to protect the Plaintiffs and the Class from the natural consequences of an oil spill from the Pipeline.

67.   Defendants were engaged in an ultrahazardous activity by transporting and processing hazardous crude oil.

68.   Plaintiffs and the Class have suffered harm as a result of the Spill emanating from Defendants' Pipeline, including but not limited to: disruption of their business, inconvenience, loss of business opportunities, lost profits, lost earnings, lost earning capacity, loss of business reputation, and other expenses.

69.   The injuries sustained by Plaintiffs and the Class as a result of the Spill and its aftermath were the direct and proximate result of Defendants' activities.

70.   The harm to Plaintiffs and the Class was and is the kind of harm that would be reasonably anticipated as a result of the risks created by processing and transporting hazardous crude oil, and not properly maintaining the Pipeline in its close proximity to the Huntington Beach, California shoreline.

71.   Defendants' harm to Plaintiffs' economic interests was foreseeable, because the leak of hazardous crude oil would reasonably impact persons conducting business in the areas nearby the shore.

72.   Defendants' actions were directly contrary to California and United States policy to preserve and protect the environment.

73.   Defendants' operation of the Elly and the Pipeline and resulting Spill was and remains a substantial factor in causing the harms suffered by Plaintiffs and the Class.

74.   Defendants are liable to Plaintiffs and Class Members for all damages arising from this ultrahazardous activity, including all compensatory damages, and punitive damages pursuant to Cal Civ. Code § 3294, and attorney's fees pursuant to Cal Civ. Code § 1021.5.

75.   Defendants are liable to Plaintiffs and Class Members for all damages arising from their violation of California Civil Code section 3479, California Health

& Safety Code section 25510(a), and California Government Code section 8670.56.5, including compensatory and injunctive relief, punitive damages pursuant to California Civil Code section 3294, and attorneys' fees pursuant to California Code of Civil Procedure section 1021.5.

76. The wrongful acts, representations and/or omissions of Defendants, hereinabove set forth, were made, adopted, approved, authorized, endorsed and/or ratified by their officers, directors or managing agents, and were done maliciously, oppressively, fraudulently and/or with a willful and knowing disregard of the probable dangerous consequences for the health and safety of Plaintiffs and their community. The officers, directors and/or managing agents of Defendants had advanced knowledge of aging infrastructure, including but not limited to: aging wells, pipelines, and/or safety systems; and/or the lack of an effective integrity management program to ensure the safety of the operation of their oil platform and pipelines. The officers, directors and/or managing agents of Defendants also had advanced knowledge that a failure to maintain, inspect, assess, replace, and/or repair infrastructure would result in the probability of a catastrophic event, which foreseeably would lead to harm and/or injuries to the health and safety of Plaintiffs and their community, generally.

77. In failing to take protective measures to safeguard against the danger, the officers, directors and/or managing agents of Defendants acted with a willful and/or knowing disregard of the probable dangerous consequences, and/or acted with an awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences, thereby creating a substantial risk of injury to Plaintiffs and the California coastal cities impacted by the Spill (including but not limited to Huntington Beach, Newport Beach, Dana Point, and Laguna Beach, California). Plaintiffs and Class Members are entitled to punitive and exemplary damages in an amount to be ascertained, which is appropriate to punish or set an example of Defendants and deter such behavior by Defendants and others in the future.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CAUSE OF ACTION

### Negligence

78.    Plaintiffs and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

79.    Plaintiffs and Class Members are individuals and entities who conduct business on or within a short distance of the California coast, and/or within the coastal bodies of water, in Orange County, California.

80.    At all times relevant herein, Defendants owned and operated the Pipeline and Elly. Defendants owe and owed a duty to Plaintiffs and Class Members to use reasonable care in the design, construction, operation, and/or maintenance of all relevant operations and equipment.  Such reasonable care includes, but is not limited to designing, constructing, operating, and/or maintaining all operations and equipment in a manner compatible with the reasonable use and enjoyment of the nearby beach cities and the surrounding communities, and in compliance with relevant regulations and industry standards.

81.    Defendants breached this duty to Plaintiffs and the Class by negligently designing, constructing, operating, and maintaining the Pipeline; failing to implement reasonable safety and spill prevention practices; failing to conduct reasonable safety and spill inspections; and failing to promptly contain the Spill. These breaches caused the Spill, which led to Plaintiffs' and Class Members' inability to conduct their business, as well as their clients and customers to be displaced. As a foreseeable result, Plaintiffs and Class Members have been unable to conduct business in the affected area and surrounding communities, or have seen a substantial decrease in business transactions originating in the affected areas.

82.    Defendants also breached their duties of care to Plaintiffs and Class Members by violating several statutes and/or regulations including California Civil Code section 3479 (prohibiting obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property) and California Health &

Safety Code section 25510(a) (requiring handlers of hazardous material to immediately report the release or threatened release thereof to the unified program agency).

83.     Defendants knew, or should have known that their design, construction, operation, and/or maintenance could result in the Spill, and that the foregoing could and would cause significant economic harm to businesses in the surrounding communities.

84.     As a direct and proximate result of Defendants' negligence in designing, constructing, operating, and/or maintaining the Elly and the Pipeline, Plaintiffs' and Class Members' properties were, and are, being physically invaded by Defendants' crude oil.

85.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members suffered property damages as alleged herein, including physical injury to their property; as corroborated by the presence of odor and crude oil tracked onto their properties and chattels.

86.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members suffered and will continue to suffer the loss of the access to commercial fishing and trapping located in and around the California coastal cities impacted by the Spill (including but not limited to Huntington Beach, Newport Beach, Dana Point, and Laguna Beach, California).

87.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, business and reputational damage, diminution of value of business property, the cost to repair the damage and restore business property to its condition prior to the Spill, plus the value of their lost earnings as a result of Defendants' negligence.

88.     Defendants are liable to Plaintiffs and Class Members for all damages arising from their negligence, including compensatory and injunctive relief, punitive

1   damages pursuant to Cal. Civ. Code § 3294, and attorneys' fees pursuant to Cal. Civ.

2   Proc. Code § 1021.5.

3       89.    Defendants were and are in a special relationship to this Class of property

4   owners. Defendants operated Elly and the Pipeline in such close geographical

5   proximity to the Class, and with knowledge of the residential properties in close

6   proximity to the Pipeline. Defendants' operation of the Pipeline was intended to and

7   did directly affect the Class.

8       90.    Due to the geographical proximity between the Pipeline and the Class,

9   the harm to the Class from a massive Spill was clearly foreseeable.

10      91.    The Class suffered injury, which was plainly caused by the Spill.

11      92.    There is moral blame attached to the Defendants as a result of the injuries

12  to the Class and the massive damage to the environment.

13      93.    Public policy supports also finding a duty of care in this circumstance,

14  due to the Defendants' violation of California Civil Code section 3479, California

15  Health & Safety Code section 25510(a), and California Government Code section

16  8670.56.5, and Defendants' engagement in an ultrahazardous activity.

17                      **THIRD CAUSE OF ACTION**

18                       **Negligence Per Se**

19      94.    Plaintiffs incorporate by reference all allegations of the preceding

20  paragraphs as though fully set forth herein.

21      95.    Plaintiffs and Class Members are individuals and entities who conduct

22  business on or within a short distance of the California coast, and/or within the coastal

23  bodies of water, in Orange County, California.

24      96.    At all times relevant herein, Defendants owned and operated the Pipeline

25  and Elly. Defendants owe and owed a duty to Plaintiffs and Class Members to use

26  reasonable care in the design, construction, operation, and/or maintenance of all

27  relevant operations and equipment. Such reasonable care includes, but is not limited

28  to designing, constructing, operating, and/or maintaining all operations and equipment

**COMPLAINT FOR DAMAGES**
20

in a manner compatible with the reasonable use and enjoyment of the nearby beach cities and the surrounding communities, and in compliance with relevant regulations and industry standards.

97.    Defendants breached this duty by negligently, wantonly, carelessly and/or recklessly designing, constructing, operating, and maintaining the Pipeline; failing to implement reasonable safety and spill prevention practices; failing to conduct reasonable safety and spill inspections; and failing to promptly contain the Spill. These breaches caused the Spill, which lead to the physical injury of Plaintiffs' and Class Members' business, commercial, and property rights.

98.    In doing so, Defendants have violated several statutes and/or regulations including Cal Civ. Code § 3479 (prohibiting obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property), Cal. Health & Safety Code § 25510(a) (requiring handlers of hazardous material to immediately report the release or threatened release thereof to the unified program agency), and California Government Code section 8670.56.5 (imposing liability for any damages or injury resulting from an oil spill).

99.    Plaintiffs and Class Members, as property owners or lessors affected by Defendants' violation of the above statutes, are within the class of persons these statutes are designed to protect.

100.    As a direct and proximate result of Defendants' violation of these statutes, Plaintiffs' and Class Members' properties were, and are, being physically invaded by the Spill.

101.    As a direct and proximate result of Defendants' foregoing statutory violations, Plaintiffs and Class Members suffered property damages as alleged herein, including physical injury to their property; as corroborated by the presence of odor and crude oil tracked onto their properties and chattels.

102.    As a direct and proximate result of Defendants' statutory violations, Plaintiffs and Class Members suffered and will continue to suffer, the loss of the quiet

use and enjoyment of their property rights as well as enjoyment of public properties located in the California coastal cities impacted by the Spill (including but not limited to Huntington Beach, Newport Beach, Dana Point, and Laguna Beach, California).

103.   As a direct and proximate result of Defendants' statutory violations, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, business and reputational damage, diminution of value of business property, the cost to repair the damage and restore business property to its condition prior to the Spill, plus the value of their lost earnings as a result of Defendants' statutory violations.

104.   Defendants are liable to Plaintiffs and Class Members for all damages arising from their violation of Cal Civ. Code § 3479, Cal. Health & Safety Code § 25510(a), and Cal. Gov. Code § 8670.56.5, including compensatory and injunctive relief, punitive damages pursuant to Cal. Civ. Code § 3294, and attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5.

## FOURTH CAUSE OF ACTION

### Trespass

105.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

106.   Plaintiffs and Class Members have now and had at the time of the Spill a possessory interest in their real, personal, and business property, and bring this cause of action on behalf of themselves and all other Class members with a possessory ownership or leasehold interest in property.

107.   Defendants caused a trespass by discharging through the Spill crude oil and other potential unknown chemicals and matter; outside the Pipeline and beyond the boundary of Elly in such a manner that it was reasonably foreseeable that the pollutants would, in due course, invade Plaintiffs' and Class Members' real property and cause physical injury to that property.

108.   The Spill invaded the property of Plaintiffs and the Class, and interfered with their possessory interests of that property.

109.   The Spill invaded the real property of Plaintiffs and the Class caused physical damage to their property by casting over and infusing their real property with a distinct smell and causing crude oil to be tracked onto their property and chattels from the Pacific Ocean and beach.

110.   The Spill caused Defendants to enter, invade, and intrude on the real properties of Plaintiffs and the Class Members without their privilege, permission, consent, authorization, invitation, or justification.

111.   Defendants had a duty to use reasonable care not to enter, invade, or intrude on the real property of Plaintiffs and the members of the proposed Class. Defendants also owed a duty to Plaintiffs and members of the Class to exercise reasonable care in the construction, maintenance, and operation of Elly and the Pipeline because of the close proximity to coastal cities.

112.   Defendants had a heightened duty of care to Plaintiffs and the Class because of the great danger associated with processing and transporting crude oil. Defendants' maintenance and operation of Elly and the Pipeline was inherently dangerous, posed a significant risk of harm to Plaintiffs and members of the Class and their property, and constituted an ultrahazardous activity.

113.   Defendants breached the duty they owed to Plaintiffs and members of the Class when they failed to exercise reasonable care in the construction, maintenance, and operation of the Pipeline, which conduct resulted in entry, intrusion, or invasion of Plaintiffs' and Class Members' real properties.

114.   Defendants knew or should have known that their conduct and the ongoing operation and maintenance of the Pipeline would foreseeably result in the disastrous Spill, causing damage to the real properties and economic interests of persons in the area affected by the Spill. As a direct and proximate result of Defendants' trespass, Plaintiffs and Class Members have suffered legal injury and

damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, the cost to repair the damage and restore the property to its pre-trespass condition, the costs of recovering possession of the property, plus the value of their lost use of the property as a result of all trespass and for Defendants' ongoing trespass, if any, and attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5.

115.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class members to punitive damages.

## FIFTH CAUSE OF ACTION

### Permanent Private Nuisance

116.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

117.    The Spill and Defendants' operation of Elly and the Pipeline have created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property, and where another catastrophic discharge is likely to happen at any moment. As a result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a permanent loss of use and enjoyment of their property.

118.    Defendants' operation of the Pipeline is a condition that would reasonably annoy and disturb an ordinary person, as shown, for example, by the major event cancellations, business closures, community outrage in response to the Spill, and the nationwide interest in the impact of the Spill on the environment.

119.    The seriousness and gravity of the harm associated with the Spill and continued operation of the Pipeline outweigh the public benefit of Defendants' conduct. There is no social utility associated with the release of hundreds of thousands of gallons of crude oil into the Pacific Ocean and onto nearby coastal communities.

120.    Plaintiffs and the Class suffered and continue to suffer a harm and injury to their residential properties to which they did not consent, and which is different from the type of harm suffered by the general public.

121.   Defendants' conduct was a substantial factor in causing harm to Plaintiffs and the Class to suffer and to continue to suffer economic harm, injury, and losses, including injury to property.

122.   The contamination described herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code.

123.   Plaintiffs and the Class are informed and believe, and on that basis allege, that the nuisance is permanent and unabatable.

## SIXTH CAUSE OF ACTION

### Permanent Public Nuisance

124.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

125.   The Spill and Defendants' operation of Elly and the Pipeline have created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property, and where another catastrophic discharge is likely to happen at any moment. As a result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a permanent loss of use and enjoyment of their property.

126.   Defendants' operation of the Pipeline is a condition that would reasonably annoy and disturb an ordinary person, as shown, for example, by the major event cancellations, business closures, community outrage in response to the Spill, and the nationwide interest in the impact of the Spill on the environment.

127.   The seriousness and gravity of the harm associated with the Spill and continued operation of the Pipeline outweigh the public benefit of Defendants' conduct. There is no social utility associated with the release of hundreds of thousands of gallons of crude oil into the Pacific Ocean and onto nearby coastal communities.

128.   Plaintiffs and the Class suffered and continue to suffer a harm and injury to their residential properties to which they did not consent, and which is different from the type of harm suffered by the general public.

129.   The Spill also affects and continues to affect the public at large, causing massive environmental damage to the Orange County area and the State of California.

130.   Defendants' conduct is a substantial factor in causing Plaintiffs and the Class to suffer and to continue to suffer economic harm, injury, and losses, including injury to property, loss of use and enjoyment of their property, and diminution in property values. Plaintiffs and the Class are entitled to damages for all such past, present, and future injuries.

131.   The contamination described herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code.

132.   Plaintiffs and Class Members are informed and believe, and on that basis allege, that the nuisance is permanent and unabatable.

## SEVENTH CAUSE OF ACTION

### Continuing Private Nuisance

133.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein. This count is pled in the alternative.

134.   The Spill and Defendants' operation of Elly and the Pipeline have created an ongoing condition that is harmful to health and interferes with the comfortable enjoyment of life and property.  Absent abatement, Defendants' actions and inactions will likely soon result in another catastrophic discharge.  As a result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a loss of use and enjoyment of their property.

135.   Defendants' operation of the Pipeline is a condition that would reasonably annoy and disturb an ordinary person, as shown, for example, by the major event cancellations, business closures, community outrage in response to the Spill, and the nationwide interest in the impact of the Spill on the environment.

136.   The seriousness and gravity of the harm associated with the Spill and continued operation of the Pipeline outweigh the public benefit of Defendants' conduct. There is no social utility associated with the release of hundreds of thousands

1   of gallons of crude oil into the Pacific Ocean and onto nearby coastal communities.

2      137.   Plaintiffs and the Class have suffered and, absent abatement, will

3   continue to suffer a harm and injury to their residential properties to which they did

4   not consent, and which is different from the type of harm suffered by the general

5   public.

6      138.   The Spill has also affected the public at large, causing massive

7   environmental damage to the Orange County area and the State of California.

8      139.   Defendants' conduct was a substantial factor in causing harm to Plaintiffs

9   and the Class to suffer and to continue to suffer economic harm, injury, and losses,

10  including injury to property.   Plaintiffs and the Class are entitled to damages for all

11  such past and present injuries.

12     140.   The contamination described herein constitutes a nuisance within the

13  meaning of Section 3479 of the California Civil Code.

14     141.   Plaintiffs and Class Members are informed and believe, and on that basis

15  allege, that the nuisance is continuing and unabatable.

16  **EIGHTH CAUSE OF ACTION**

17  **Continuing Public Nuisance**

18     142.   Plaintiffs incorporate by reference all allegations of the preceding

19  paragraphs as though fully set forth herein. This count is pled in the alternative.

20     143.   The Spill and Defendants' operation of the Facility have created an

21  ongoing condition that is harmful to health and interferes with the comfortable

22  enjoyment of life and property.   Absent abatement, Defendants' actions and inactions

23  will likely soon result in another catastrophic discharge.   As a result of Defendants'

24  actions and inactions, Plaintiffs and Class Members have suffered a loss of use and

25  enjoyment of their property.

26     144.   Defendants' operation of the Pipeline is a condition that would

27  reasonably annoy and disturb an ordinary person, as shown, for example, by the major

28  event cancellations, business closures, community outrage in response to the Spill,

and the nationwide interest in the impact of the Spill on the environment.

145.   The seriousness and gravity of the harm associated with the Spill and continued operation of the Pipeline outweigh the public benefit of Defendants' conduct.  There is no social utility associated with the release of hundreds of thousands of gallons of crude oil into the Pacific Ocean and onto nearby coastal communities.

146.   Plaintiffs and Class Members have suffered and absent abatement will continue to suffer a harm and injury to their residential properties to which they did not consent, and which is different from the type of harm suffered by the general public.

147.   The Spill has also affected the public at large, causing massive environmental damage to the Orange County area and the State of California.

148.   Defendants' conduct is a substantial factor in causing harm to Plaintiffs and Class Members to suffer and to continue to suffer economic harm, injury, and losses, including injury to property, loss of use and enjoyment of property, and diminution in property values. Plaintiffs and Class Members are entitled to damages for all such past and present injuries.

149.   The contamination described herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code.

150.   Plaintiffs and Class Members are informed and believe, and on that basis allege, that the nuisance is continuing and abatable.

## **NINTH CAUSE OF ACTION**

### **Violations of California's Unfair Competition Law**

### **Cal. Bus. & Prof. Code §§ 17200, et seq.**

151.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

152.   Defendants have engaged in and continue to engage in unfair competition in violation of California's Unfair Competition Law ("UCL").

---

153.   Defendants' conduct constitutes unlawful and unfair business practices within the meaning of the UCL.

154.   Defendants' conduct amounts to unlawful conduct because their conduct constitutes common law negligence, trespass, and nuisance, and they violated Civ. Code § 3479 (prohibiting obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property), Cal. Health & Safety Code § 25510(a) (requiring handlers of hazardous material to immediately report the release or threatened release thereof to the unified program agency), and California Government Code section 8670.56.5 (imposing liability for any damages or injury resulting from an oil spill).

155.   Defendants' conduct amounts to "unfair" business practices because the policies underlying the statutes and the common law are implicated by Defendants' misconduct. Defendants' practices offend established public policies, are dishonest, unfair, and do not comport with standards of care embodied in various statutes and common laws, including negligence. The impact of Defendants' practices on Plaintiffs and the Class Members, and the environment has been sustained and substantial, and is in no way mitigated by any justifications, reason, or motives. Defendants' conduct relating to the Spill has no utility when compared to the harm done to Plaintiffs and members of the Class.

156.   As a direct and proximate result of Defendants' unfair and unlawful methods of competition, acts or practices, Plaintiffs and Class Members have sustained injury to property and are entitled to injunctive relief pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

## **TENTH CAUSE OF ACTION**

**Lost Profits and Earning Capacity Damages Under Federal Oil Pollution Act of 1990, §§ 1002, 1006**

157.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

158.   At all times herein, Defendants were the owners and operators of the Pipeline and Elly.

159.   The Pipeline constitutes a "facility" under the Federal Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701(9), which defines "facility" as "any structure, group of structures, equipment, or device (other than a vessel) which is used for…exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil," including pipelines.

160.   The Spill from the Pipeline constitutes a "discharge" under the OPA, which defines "discharge" as "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping."  33 U.S.C. § 2701(7).

161.   The oil discharged by the Pipeline constitutes "oil" under the OPA, which defines "oil" as "oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil …."  33 U.S.C. § 2701(23).

162.   The waters of the Pacific Ocean off the Southern California coast constitute "navigable waters" under the OPA, which defines "navigable waters" as "the waters of the United States, including the territorial sea."  33 U.S.C. § 2701(21).

163.   Defendants, and each of them, constitute a "responsible party" under the OPA, which defines "responsible party" as, in pertinent part, "In the case of a pipeline, any person owning or operating the pipeline."  33 U.S.C. § 2701(32)(F).

164.   By virtue of the acts and omissions alleged in this Complaint, culminating in the Pipeline discharging at least 144,000 gallons of oil in the Pacific Ocean, causing it to wash on shore in Orange County, Defendants have caused the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.

165.   Under the OPA, Defendants are responsible for a facility (the Pipeline) from which oil was discharged into or on the navigable waters or adjoining shorelines

of Orange County, California, and Defendants are thus strictly liable to Plaintiffs and Class Members for the resulting damages, including, but not limited to, damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. 33 U.S.C §§ 2702(a)-(c).

166.    By virtue of the acts and omissions alleged in this Complaint, Defendants are jointly and severally liable and/or vicariously liable for each other's acts and omissions, and consequently for the mentioned damages under the OPA.

**ELEVENTH CAUSE OF ACTION**

**Strict Liability Under Lempert-Keene-Seastrand Oil Spill Prevention and Response Act**

**Cal Gov. Code § 8670.1, *et seq***

167.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

168.    The Lempert-Keene Seastrand Oil Spill Prevention and Response Act provides that "[a] responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured person that arise out of, or are caused by, a spill." Cal. Gov. Code § 8370.56.5(a).

169.    The waters of the Pacific Ocean are "marine waters" as defined in Government Code § 8670.3(j).

170.    The petroleum discharged into the Pacific Ocean by the Pipeline was "oil" as defined in Government Code § 8670.3(p)(1).

171.    The unauthorized spill or discharge from the Pipeline, releasing oil into the Pacific Ocean, constitutes a "spill" or "discharge" of oil as defined in Government Code § 8670.3(ag).

172.    The Pipeline is a "pipeline" as defined in Government Code § 8670.3(v).

173.    Defendants are each a "responsible party" as defined in Government Code § 8670.3(ac)(1).

174.   The Act entitles a plaintiff to recover damages for, among other losses, loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, recoverable by any claimant who derives at least 25 percent of their earnings from the activities that utilize the property or natural resources, or, if those activities are seasonal in nature, 25 percent of earnings during the applicable season.  Cal. Gov. Code § 8670.56.5(h)(6).

175.   Plaintiffs and members of the Commercial Ocean and Beach Activities Class are surf schools and rental services who derive at least 25 percent of their earnings from activities that utilize the Pacific Ocean.  Defendants' discharge of oil into the Pacific Ocean caused beaches and ocean activities to be shut down, preventing Plaintiffs and class members from conducting their business activities.

176.   Plaintiffs and members of the Class have incurred costs and damages, including damages for commercial losses, as a result of the discharge of oil into marine waters.  Because Plaintiffs and class members derive at least 25 percent of their annual earnings from activities that utilize natural resources damaged by Defendants' oil discharge, Defendants are liable to Plaintiffs and class members under the Act.

177.   Defendants are absolutely liable under Government Code § 8670.56.5 (f) and (h) without regard to fault for all damages resulting from the discharge of oil from the Pipeline, including but not limited to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources; and for attorney's fees, costs of suit, and expert witnesses.

## TWELFTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

178.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

179.   Plaintiffs and Class members have existing or prospective economic relationships with the residents of Orange County, visitors to Orange County, and other individuals and organizations doing business in and related to Orange County.

180.  These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs and Class members.

181.  Defendants knew or should have known of these existing and prospective economic relationships.

182. Defendants owed a duty to Plaintiffs and Class members to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs and Class members.

183. Defendants breached that duty to Plaintiffs and Class members by, among other things, failing to install and/or maintain reasonable safety equipment to prevent such an oil spill, failing properly to maintain the Pipeline in a safe condition, and failing to promptly respond to and contain the spill.

184.  Defendants knew or should have known that, if they failed to act with reasonable care, the existing and prospective economic relationships of Plaintiffs and Class members would be interfered with and disrupted.

185.  Defendants were negligent and failed to act with reasonable care as set forth above.

186.  Defendants engaged in wrongful acts and/or omissions as set forth above, including but not limited to their violations of federal, state, and local laws that require Defendants to operate the Pipeline in a manner that does not damage public health and safety.

187.  As a direct and proximate result of Defendants' wrongful acts and/or omissions, Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiffs and Class members.

188.  As a direct and proximate result of Defendants' wrongful acts and/or omissions, Plaintiffs and Class members have suffered and will suffer economic harm, injury, and losses as set forth above.

## VII.    PRAYER FOR RELIEF

Plaintiffs individually and on behalf of all others similarly situated, request

**COMPLAINT FOR DAMAGES**

33

judgment against Defendants as follows:

        A.    For an order certifying the Class and appointing Plaintiffs as representatives of the Class and appointing the undersigned as Class Counsel;

        B.    For an order enjoining Defendants to stop trespassing on the properties of Plaintiffs and the Class, to remove the contaminants from their property interests and assets;

        C.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable laws;

        D.    For costs;

        E.    For both pre-judgment and post-judgment interest on any amounts awarded at the highest allowable rate;

        F.    For appropriate injunctive relief, including public injunctive relief;

        G.    For damages insofar as they are allowed by applicable laws;

        H.    For payment of attorneys' fees as may be allowable under applicable law;

        I.    For payment of expert fees as may be allowable under applicable law;

        J.    For exemplary or punitive damages under Cal. Civ. Code Section 3294 for the oppression, fraud, or malice alleged above; and

        K.    For such other and further relief including declaratory relief, as the Court may deem just and proper.

## **REQUEST FOR JURY TRIAL**

Plaintiffs, individually, and on behalf of a Class of others similarly situated, hereby respectfully request a trial by jury of all causes of action and issues so triable.

1

2

3

4    Dated: December 23, 2021          **DiMarco │ Araujo │ Montevideo**
                                        A Professional Law Corporation
5

6

7                                       By:   _/s/ Erin L. Boeck_____
                                              John A. Montevideo
8                                             Erin L. Boeck
                                              Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28